| | |
|---|---|
| FAIRY-MART ET AL, | No. 3:17-cv-1195 (MPS) |
| Plaintiffs, | |
| v. | |
| MARATHON PETROLEUM COMPANY, LP and PETROLEUM MARKETING GROUP, INC., | |
| Defendants. | |

## MEMORANDUM AND ORDER

This case requires me to decide how to enforce an individual gas station franchisee's statutory right of first refusal to purchase the real estate associated with its station when the franchisor proposes to sell that real estate to a third party as part of a package of gas station properties. In certain circumstances, Connecticut law requires a gas station franchisor, which generally owns the land on which the station is located, to offer the franchisee, or operator, of the station, "a right of first refusal of *a bona fide offer* made by another acceptable to the [franchisor], to purchase such [franchisor's] interest in [the premises at which the gas station is located]." Conn. Gen. Stat. § 42-133mm(c)(2) (emphasis added). The plaintiffs in this case, three Connecticut gas station franchisees, seek to enjoin portions of a transaction by which Defendant Petroleum Marketing Group, Inc. ("PMG"), proposes to purchase a total of 26 gas station premises from Defendant Marathon Petroleum Company, LP ("Marathon"), which currently leases three of those premises to the plaintiffs under franchise agreements. The plaintiffs claim that, although this proposed transaction includes an individual offer by PMG to purchase the real estate associated with each of their stations, the offer in each case is not a "bona fide offer," as required by the

statute, because it bears no reasonable relationship to the fair market value of that real estate. They have moved for a preliminary injunction barring the transaction as to the three properties.

After hearing evidence and argument on the issue, I agree with the plaintiffs and GRANT their motion for a preliminary injunction. The plaintiffs have shown irreparable harm because, once PMG purchases their stations, their statutory right of first refusal—whatever its proper scope—will be irretrievably lost, and money damages for that loss would be extremely difficult to calculate. The plaintiffs have also shown a likelihood of success on the merits of their claim under the Connecticut Unfair Trade Practices Act, §§ 42-110a et seq. ("CUTPA"), for violation of the public policy reflected in the right-of-first-refusal statute (and they have at least raised sufficiently serious questions going to the merits of that claim to make them fair ground for litigation, and shown that the balance of hardships tips in their favor). The evidence at the preliminary injunction hearing showed that the allocation of individual prices to the plaintiffs' stations within PMG's global offer of $30 million for the 26 stations was driven primarily by PMG's desire to defeat the plaintiffs' statutory rights of first refusal, rather than by the fair market value of each of the plaintiffs' three stations. While PMG has made a binding offer to pay each of those individual amounts, the statute requires more than a binding commitment for an offer to be "bona fide," at least in the context of a multi-station transaction in which it is possible to allocate prices to individual stations that bear no reasonable relationship to their fair market value without affecting the global price of the overall deal.

The defendants are hereby enjoined from closing on the purchase and sale of each of the plaintiffs' three properties; this order does not affect the defendants' ability to close the purchase and sale of any of the other 23 stations involved in the transaction. However, because the parties have not briefed the issue of what security the Court should require the plaintiffs to post to pay

any damages sustained by defendants if they are found to have been wrongfully enjoined, the Court hereby stays this order for 14 days. Within that 14-day period, the parties shall confer and shall either (1) file a joint statement setting forth their joint or respective positions as to the proper amount of a bond or other security, or (2) failing that, file separate motions with respect to the posting of security. *See* Fed. R. Civ. P. 65(c).

## I.     BACKGROUND

The plaintiffs filed this case in state court on July 7, 2017. (ECF No. 1-1.) On July 18, 2017, the defendants, Marathon and PMG, removed the case to federal court. (ECF No. 1.) In the removed complaint, the plaintiffs sought, among other things, declaratory relief for violation of Section 42-133mm(c) of the Connecticut Petroleum Franchise Act. The complaint, which stems from the pending sale of the real estate associated with the plaintiffs' gas stations from Marathon to PMG, alleged that the defendants failed to offer them a right of first refusal of a bona fide offer to purchase, as required by Section 42-133mm(c). The plaintiffs also filed a motion for a preliminary injunction, seeking to enjoin PMG's purchase of their stations.

On July 26, 2017, I held a telephonic status conference to set a schedule for discovery and briefing related to the motion for preliminary injunction. (ECF No. 20.) Although the transactions was set to close on August 16, following the call, the defendants agreed to postpone the sales of the three properties at issue in the plaintiff's complaint until I held a hearing on the motion for preliminary injunction. On August 18, 2017, the plaintiffs filed a memorandum in support of their motion for a preliminary injunction. (ECF No. 28.) Defendants' opposition was filed on August 25. (ECF No. 31.)

On October 5, 2017, the plaintiffs filed an amended complaint. (ECF No. 43.) In their amended complaint, the plaintiffs allege seven claims: (1) declaratory relief, (2) breach of the

Connecticut Petroleum Franchise Act[1], Conn. Gen. Stat. §§42-133j et seq. ("CPFA"), (3) breach of contract, (4) violation of the CUTPA, (5) breach of the implied covenant of good faith and fair dealing, (6) tortious interference with a contract, and (7) tortious interference with business relations. On October 6, 2017, I held an evidentiary hearing on the motion for a preliminary injunction. The following findings of fact and conclusions of law are based on the evidence adduced at that hearing.

## II.    FINDINGS OF FACT[2]

Plaintiffs operate Hess-branded retail gasoline stations in Connecticut. Plaintiff Fairy-Mart, LLC has operated a station in Norwich, Connecticut, since 2005; plaintiff G.S.P.C. Inc. has operated a station in Southington, Connecticut, since 2007; and plaintiff Michael Olsen has operated a station in Waterford, Connecticut, since 1972. All three stations can be described as modest: all of the stations lack a canopy cover; all have small kiosks that sell just a few items— snacks, beverages, and cigarettes; and all have dated equipment, including their storage tanks. None of the plaintiffs own or operate any other stations in Connecticut or anywhere else.

Defendant Marathon is a Delaware limited partnership with its principal place of business in Findlay, Ohio. It is a petroleum refining, marketing, and transportation company that sells its gasoline at 5,550 branded locations in approximately 19 states in the Midwest and Southeast United States. Defendant PMG is a wholesale distributor (or "jobber") of petroleum products and services. It is a Maryland corporation, with a principal place of business in Woodbridge, Virginia.

---

[1] Although some courts alternately have referred to this act as the "Connecticut Petroleum Products Franchise Act", which is the name the plaintiffs also use in their papers, this name refers to the same statute—Conn. Gen. Stat. §§42-133j et seq.

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice-versa.

It owns, operates, and/or supplies more than 1,000 retail gasoline station locations and has an annual volume of over 1 billion gallons of motor fuel.

In 2014, Marathon purchased assets from the Hess Corporation, including Hess's interest as franchisor of, and the real estate associated with, 17 retail gas stations in Connecticut—three of which were the stations the plaintiffs operate. Prior to this transaction, Hess had been the franchisor for these stations, under a series of dealer agreements. Hess transferred its interests under these agreements to Marathon, along with its ownership, or long-term leasehold, interest in the associated real estate, which I will refer to as the "marketing premises," using the terminology of the CPFA. *See* Conn. Gen. Stat. § 42-133mm(d). Deeds for these properties show that Marathon purchased the Norwich station for $280,000, the Southington station for $530,000, and the Waterford station for $159,323. Since September 2014, Marathon has operated as the franchisor to the three plaintiffs. When the plaintiffs' individual Hess dealer agreements expired, each plaintiff entered into a new dealer agreement with Marathon, under which the plaintiffs' stations continued to operate as Hess-branded locations.

In 2016, Marathon decided to sell the Hess-branded marketing premises it owned. Marathon wrote a letter to each of the plaintiffs, dated August 8, 2016, stating that it intended to sell, transfer, or assign these assets and inviting each of the plaintiffs to submit a bid for the property on which it operated a station. Marathon wrote that it had "implemented a bid process that was for all prospective buyers . . . and that it was the intention to implement a standardized bid process so that a fair and equal opportunity for all bidders is available." (ECF No 1-1 at 18.) Marathon further provided a timeline for the bid process, a warning that late bids would not be considered, and a list of factors other than bid amount that might affect Marathon's selection of a winning bid. Marathon indicated that the plaintiffs could gain access to a dataroom with

information about their specific station (but no other station) to use to formulate a bid. Two of the plaintiffs accessed the datarooms for their stations. None of the plaintiffs submitted a bid to purchase their stations before the deadline.

On October, 14, 2016, PMG submitted an initial bid for 33 of Marathon's Hess-branded locations, including the marketing premises of the three stations the plaintiffs operate. PMG was one of the jobbers to which Marathon had extended its offer to submit a bid. Hossein Ejtemai controls PMG and also operates several of the Washington, D.C. stations in the group that PMG offered to purchase. PMG offered $18,985,000 for these locations, included an offer to commit to rebrand other locations for which PMG was a supplier, and proposed to purchase an additional 10 million gallons of motor fuel from Marathon. As part of this bid, PMG allocated the $18,985,000 purchase price among the specific stations. For the plaintiffs' stations, PMG offered: (1) $250,000 for the Norwich station, (2) $550,000 for the Southington station, and (3) $175,000 for the Waterford station. After it realized there had been a miscalculation—the first bid had not accounted for the value of a vacant residential lot adjacent to one of the Washington, D.C. stations in the package—PMG submitted a "corrected first bid." (ECF No. 48 at 67.) In this revised bid, the allocations for the plaintiffs' stations were: (1) $750,000 for the Norwich station, (2) $850,000 for the Southington station, and (3) $650,000 for the Waterford station.

After receiving PMG's bid, Marathon indicated that it was interested in negotiating for a sale of 26 of the 33 stations included in the original offer to bid. Marathon told PMG that it would accept $30 million for this set of 26 locations in Connecticut, New York, New Jersey, Pennsylvania, Maryland, Virginia, and the District of Columbia. The plaintiffs' three stations were included in this set of 26. Marathon again stated that PMG would need to allocate purchase prices—totaling to $30 million—for each of the stations and then sign individual offers to purchase

for each location. PMG agreed to offer a total of $30 million for these locations and agreed to formulate an allocation of 26 individual purchase prices. PMG also agreed to enter into a long-term supply agreement, obligating itself to purchase a set volume of Marathon-branded motor fuel for distribution to certain retail locations.

Jeff Bucaro, PMG's director of assets, testified about the process of developing the final station-specific allocations. He stated that Marathon had no involvement in this process, and no evidence was offered to rebut that statement. Bucaro created a spreadsheet to formulate the allocations. Within the spreadsheet, Bucaro inserted two columns specifying the allocations that PMG previously had assigned to the 26 locations as part of its initial and revised initial bids (when it was bidding on the group of 33 stations). He also included a column showing for each station the estimated earnings before interest, tax, depreciation, and amortization ("EBITDA")—which is a way to evaluate a business's performance without considering financing, accounting, or tax issues and which Bucaro testified is a common basis for valuing gas stations in purchase transactions. (ECF No. 48 at 61.) He testified that although some of these data came from the Marathon data room and were "hard numbers," other entries—like the gas margins numbers—were just his own guesses that he was using as placeholders while he was formulating the allocations. (ECF No. 48 at 105–06.) He sent an email to Ejtemai on January 2, 2017, with a draft allocation of the $30 million over the 26 sites and reviewed the specific allocations with Ejtemai. He sent the final allocation to Marathon on February 16, 2017. Marathon accepted these allocations. The final prices allocated to the plaintiffs' stations were: (1) $1,000,000 for the Norwich station, (2) $1,750,000 for the Southington station, and (3) $1,000,000 for the Waterford station.

Bucaro testified that he did not receive any new information about the properties between January 2 (when he sent the list of revised offers to Ejtemai) and February 16, 2017 (when he sent the final allocation list to Marathon) that would have altered the value he assigned to each. Nonetheless, the allocated prices for the marketing premises associated with the plaintiffs' stations increased between the draft Bucaro sent to Ejtemai on January 2 and the final proposal PMG sent to Marathon on February 16. And they were not the only ones. Between the draft allocation and the final allocation, the allocated prices for all stations in states with statutory rights of first refusal (namely, New Jersey, Virginia, and Connecticut) increased, and thus comprised a larger share of the overall $30 million purchase price, while the allocated prices for all stations in states without rights of first refusal decreased or remained constant, and thus comprised a smaller share of the $30 million purchase price. Bucaro admitted that PMG increased the purchase price for stations in states with rights of first refusal to make it less likely that those rights would be exercised and more likely that PMG would be able to acquire all of the stations.[3] He further admitted that "the

---

Q.        . . . When you went from January 2nd to your final allocation, when you had to give Marathon that final allocation, every store in a state with the right of first refusal, you went up [in your allocation]; and in every store in a state without a right of first refusal you stayed the same or went down. Right?

A.        I believe that's correct.

Q.        And at that time you knew which states had rights of first refusal, isn't that right?

A.        Sure.

Q.        And weren't you very focused on buying all of these stations?

A.        We wanted to buy the whole package.

Q.        And that was important to PMG, is that right?

A.        Yes.

Q.        And by buying the whole package, the only way you could do that is if the operator did not exercise the right of first refusal, is that right?

A.        That would be one thing.

Q.        And by putting extra purchase price on stations that have a right of first refusal associated with them, you made it less likely that the operator would exercise that right. You knew that?

A.        Yeah, we wanted to buy – yeah, I knew that.

Q.        And the reason, sir, that you put the extra purchase price on there in order to deter those operators from having that statutory right?

A.        I wanted to buy all the stations.

Q.        That's not my question. You put the extra purchase price on there in order to deter the plaintiffs in this case and the other owners of stations—

A.        To make it less likely.

reason [for] moving the allocations around is because of the right of first refusal." (ECF No. 48 at 116.) Bucaro averred that PMG highly valued the opportunity to buy all twenty-six stations as a package deal and that that was why PMG increased the prices allocated to certain stations—but he admitted that discouraging the exercise of rights of first refusal was a primary concern.[4] Indeed, he admitted that the only reason PMG allocated the overall purchase price of $30 million to individual stations—as opposed to simply offering $30 million for the 26 stations—was that some of the stations, including the plaintiffs', were located in states with rights of first refusal, leading Marathon to demand that any global offer be broken into pieces corresponding to each station. (ECF No. 48 at 115.) In fact, PMG would have preferred to do a single contract with one price for the package of 26 states. (*Id.* at 114.)

At the hearing, the plaintiffs' expert, Kenneth Currier, testified about his own determination of the fair market value of plaintiffs' stations and the methods he used to arrive at those valuations. Mr. Currier is an "MAI real estate appraiser. [He] own[s] and operate[s] a

---

Q.    To make it less likely. That's why you did it, right?
A.    So I could buy all the stations, yeah.
Q.    You did it to buy all the stations and to make it less likely that they would exercise their statutory rights, correct?
A.    That's correct.

(ECF No. 48 at 94–96.)

[4] The Court asked Bucaro:

THE COURT: So the only basis for the allocation then is what do we think is high enough to dissuade somebody from exercising the right of first refusal? That's really the only basis for it, is that true or not?
THE WITNESS: I don't think it's the only basis.
THE COURT: What are the other bases?
THE WITNESS: We looked at volume. We looked at the ability to be able to brand whatever we wanted to brand. We looked at being able to be in that market where we're trying to grow and we don't have that many sites yet. So all those things factored together had an impact. But I'm not denying that the discouragement of the right of first refusal was something we factored in or thought about.

(ECF No. 48 at 122–23.)

company[, called] Atlantic Valuation Consultants. [It] specialize[s] in appraising gas stations and convenience stores." (*Id.* at 128.) Mr. Currier's qualifications and substantial experience in appraising gas station properties were not contested. He appraised the plaintiffs' stations as follows: he valued the real estate associated with the Norwich station at $225,000, the Southington property at $800,000, and the Waterford property at $125,000. These numbers were based on his assessment of each station's sales data, locations, set-up, equipment, and related factors. He also testified that EBITDA is the "primary multiple that people use when they're considering purchasing a [gas station]," (ECF No. 48 at 129) and that a buyer's offer is likely to reflect some multiple of EBITDA. "[T]ypically a buyer will review the historic financial information and look at the historic EBITDAs and everything that goes into that which would be margins and gallons and operating expenses." (*Id.*) Currier stated that, usually in the industry, he will see transaction prices reflecting EBITDA multiples around 5, "maybe as high as 10 or 11." (*Id.* at 131.) Similarly, Bucaro testified "four to the low teens" was the range of EBITDA multiples he had seen. (*Id.* at 64.) Currier testified that he had never seen a gas station sold at a price with an EBIDTA multiple of 15 or higher. In PMG's offer, however, he determined that the EBIDTA multiple for the Norwich store was 102.53. More generally, he stated that the allocated values for all three of the plaintiffs' locations were vastly greater than the fair market value of those properties. Finally, Currier testified about the difference between fair market value and investment value—and how the investment value of a property can be either higher or lower than the fair market value for a particular prospective buyer, as it includes features of importance to a particular buyer but not to the market in general, such as whether a transaction will yield economies of scale for the buyer.[5]

---

[5]
      THE COURT: How about things like becoming the dominant player in the market[, would that contribute to potential economies of scale for a prospective buyer?]

PMG sent its final allocation to Marathon on February 16, 2017. Marathon accepted this allocation, without negotiation.

On May 22, 2017, Marathon sent each of the plaintiffs notice of their right of first refusal. The notice informed the plaintiffs that they had forty-five days to exercise that right. The notice stated: "If you choose to exercise the right of first refusal, [Marathon] expects you will execute the offer to purchase and deposit the Earnest Money as defined in the offer to purchase. The right of first refusal will not be accepted unless and until [Marathon] receives the executed offer to purchase and the Earnest Money." (ECF No. 1-1 at 24–25.) Marathon sent, along with this notice, an "offer to purchase and a mutual cancellation agreement form." (*Id.* at 25.) The offer to purchase contained several deed restrictions that would encumber significantly the plaintiffs' ability to resell the marketing premises. The mutual cancellation form indicated that, if the plaintiffs had signed the offers to purchase and submitted the money to Marathon, their franchise relationship with Marathon would have been terminated—requiring them to find a new gas supplier. The offer to purchase sent to each plaintiff was largely identical to PMG's individual offer for each of the

---

THE WITNESS: Often that will be part of a transaction, but that would be more of an investment value versus a market value.
THE COURT: What's the difference?
THE WITNESS: Well, an investment value is a value to a particular buyer based on their own criteria. The market value is the value of the market as a whole.
THE COURT: And so in some circumstances would it be fair to say investment value can be higher or perhaps lower than fair market value?
THE WITNESS: Yes.
THE COURT: And would one of those circumstances be where as a result of a package transaction the buyer, because of its own circumstances, is able to control pricing independently in the area because they've got such a dominant presence?
THE WITNESS: Correct.
THE COURT: And that would be what you would consider to be investment value?
THE WITNESS: Yes.
THE COURT: And that would not be taken into account by you in the appraisal unless you were specifically asked, for example?
THE WITNESS: That's correct. Simply doing a market value estimate, we would not be looking at that.

(ECF No. 48 at 140–41.)

plaintiffs' stations, except that PMG's offer included provisions regarding assignment of each dealer agreement to PMG and provisions allowing Marathon to delay the closing in the event of litigation related to the transaction (such as this lawsuit).

None of the plaintiffs returned a signed offer to purchase or any earnest money before the deadline on July 7, 2017. Instead, plaintiffs brought this lawsuit.

## III.     CONCLUSIONS OF LAW

### A.     Legal Standard

To obtain a preliminary injunction, the plaintiffs must demonstrate: "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir.), *cert. dismissed sub nom. Allergan PLC v. New York ex. rel. Schneiderman*, 136 S. Ct. 581 (2015) (internal quotation marks and citation omitted).

### B.     Irreparable Harm

The plaintiffs have demonstrated that failing to grant a preliminary injunction would expose them to irreparable harm. "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Schneiderman*, 787 F.3d at 660 (internal quotation marks omitted). The Second Circuit has held that both the "termination of [a] franchise", which would "obliterate [a] dealership," and the "harm from [the] loss of an ongoing business representing may years of effort and . . . livelihood" are examples of irreparable harm. *Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks and citations omitted).

Without a preliminary injunction, the plaintiffs would suffer an irretrievable loss of their right to purchase the marketing premises for their stations. Denying the motion for a preliminary injunction and allowing Marathon to close the sale of their locations to PMG—without first determining whether Marathon offered them a right of first refusal of a "bona fide offer" as required by law—would forever deprive the plaintiffs of the opportunity to purchase these stations from Marathon. If these transactions were to proceed, and I were then to find after a full determination on the merits that Marathon failed to comply with the statute because PMG's offers were not "bona fide," the plaintiffs' stations would have been sold without an opportunity to exercise their rights of first refusal.

Further, assigning a dollar value to the missed opportunity to match a bona fide offer would be highly complicated and uncertain. Calculating the damages that might result from a violation of the plaintiffs' statutory right of first refusal would involve (1) predicting what the plaintiffs would have done had PMG made a bona fide offer, and (2) had it done so and had they exercised their rights of first refusal, predicting how their businesses might have fared had they become owners, rather than just renters, of the marketing premises. These would be highly uncertain—and probably speculative—inquiries. So the loss of plaintiffs' statutory right of first refusal is not "compensable and readily quantifiable." *See Schneiderman*, 787 F.3d at 661. Therefore, this is the type of harm that is suitable for injunctive relief.[6]

C. <u>Success on the Merits</u>

---

[6] The defendants' argument that the plaintiffs delayed by not seeking injunctive relief during the 45-day notice period is not well taken. During that period, the plaintiffs requested, but defendants refused to provide, information regarding the allocation of individual prices for the 26 properties involved in the overall transaction. Indeed, even after suit was filed, the defendants resisted the production of such information. Without such information, however, the plaintiffs could not adequately determine the bases for the prices allocated to their three stations and likely could not show that those prices did not represent "bona fide offers." I will not hold it against the plaintiffs that they attempted to gather critical information in support of their claims before burdening the Court with a motion for a preliminary injunction.

On a motion for a preliminary injunction, the plaintiffs can prevail if they can show either: (1) "a likelihood of success on the merits"; or (2) "sufficiently serious questions going to the merits of [their] claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [their] favor[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (citation and internal quotation marks omitted)). I conclude that the plaintiffs have satisfied both standards.

### 1. Claims in the Amended Complaint

Although several of the plaintiffs' claims were not supported by the evidence at the hearing, the plaintiffs have shown a likelihood of success on at least the CUTPA claim.

### a. Plaintiffs' Common Law and CPFA Claims

The plaintiffs' breach of contract and implied covenant of good faith and fair dealing claims were not supported by the evidence at the hearing. The plaintiffs argue that Marathon's actions surrounding the proposed sale of their stations to PMG was a breach of their dealer agreements because of Marathon's conditioning the plaintiffs' exercise of their rights of first refusal on entering into a mutual cancellation agreement that would terminate the dealer agreements. But the plaintiffs fail to explain how Marathon breached the dealer agreements by proposing their termination *if* the plaintiffs chose to exercise their rights of first refusal, which, to date, they have not done. The evidence at the hearing did not suggest that the plaintiffs' breach of contract claim will succeed on the merits. And, to the extent the plaintiffs rely on this same theory to support their breach of implied covenant claim, it also was unsupported by the evidence.

The plaintiffs' tortious interference claims are also not supported by the evidence presented at the hearing. The plaintiffs argued that PMG's allocations, skewed as they were to stations in states with rights of first refusal, caused Marathon to accept its overall offer and therefore would

cause the termination of Marathon's dealer agreements with PMG. However, the evidence at the hearing showed that under the terms of the PMG-Marathon transaction, PMG would assume Marathon's obligations under the dealer agreements, not terminate them. Therefore, the plaintiffs have not shown a likelihood of success on these claims either.

The plaintiffs further assert a claim directly under Conn. Gen. Stat. Section 42-133mm(c), but this provision does not provide for a private right of action. The CPFA separately provides a cause of action to enforce several of its provisions, Conn. Gen. Stat. Section 42-133n (stating that "[a]ny franchisee may bring an action for violation of sections 42-133l or 42-133m in the Superior Court to recover damages sustained by reason of such violation . . . and, where appropriate, may apply for injunctive relief"), but it does not provide a cause of action for violation of Section 42-133mm(c). So the plaintiffs cannot sue directly under this provision and therefore have not shown a likelihood of success on this claim.

b. Plaintiffs' CUTPA Claim and Declaratory Judgment Claim

CUTPA authorizes "a cause of action that builds upon the public policy embodied in specific statutory provisions," where that claim is "consistent with the regulatory principles established by the underlying statutes." *Mead v. Burns*, 199 Conn. 651, 665 (1986). Here, the plaintiff's amended complaint states that they are using CUTPA to enforce the public policy set forth in the CPFA, in particular, the statutory right of first refusal in Conn. Gen. Stat. § 42-133mm(c). As discussed below, because I find that the plaintiff's interpretation of 42-133mm(c) is the more plausible one, I find that they have shown a likelihood of success on their CUTPA claim seeking to enforce the public policy of that provision. For the same reason, plaintiffs have shown a likelihood of success on the merits as to their claim for a declaratory judgment that the defendants "violated state law," i.e., Section 42-133mm(c). (ECF No. 49 at ¶ 59.)

## 2. Interpretation of Section 42-133mm(c)

The parties have not cited any case law interpreting Section 42-133mm, and I have not found any. I begin with the language of subsection (c), which addresses a situation where a franchisor sells to a successor a package of individual marketing premises (i.e., "premises which, under a franchise agreement, are to be employed by a franchisee in connection with the sale, consignment or distribution of motor fuel," Conn. Gen. Stat. Sec. 42-133mm(d)), and the successor owner subsequently sells its interest in these marketing premises, which are leased by a franchisee. Subsection (c) states that

> the new owner shall first (1) make a bona fide offer to sell, transfer or assign to the franchisee such successor owner's interest in the marketing premises; or (2) if applicable, offer the franchisee a right of first refusal of a bona fide offer made by another acceptable to the successor, to purchase such successor owner's interest in such marketing premises. The franchisee shall have forty-five days in which to accept or reject such offer made under subdivision (1) or (2) of this subsection.

Here, Marathon was the successor to Hess as franchisor, and it wanted to sell these locations—which are leased by the plaintiff franchisees—to PMG.

Marathon sought to use the second option provided for in subsection (c): to "offer the [plaintiffs] a right of first refusal of a bona fide offer made by [PMG] acceptable to [Marathon], to purchase [Marathon's] interest in such marketing premises." The plaintiffs do not dispute that Marathon sent them notice of PMG's offer and provided a forty-five day window for exercising a right of refusal; the issue is whether PMG's offer for each of the marketing premises associated with the plaintiffs' stations was "bona fide."

Dictionaries define "bona fide" as "made in good faith; without fraud or deceit" and "sincere" or "genuine." *See, e.g.*, Black's Law Dictionary, Ninth Ed. Defendants argue that the absence of evidence of collusion between PMG and Marathon and the fact that PMG made separate binding offers to purchase the three plaintiffs' properties are sufficient to satisfy this definition.

16

But a court's "duty [is] to construe statutes, not isolated provisions," *Gustafson v. Alloyd. Co., Inc.*, 513 U.S. 561, 568 (1995), and it is necessary to look to the CPFA as a whole to gain a complete understanding of what constitutes a "bona fide offer" in this context. *See Puello v. Bureau of Citizenship and Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007) ("In ascertaining the plain meaning of a statute, the court must look to the particular statutory language at issue as well as the language and design of the statute as a whole." (internal quotation marks omitted)). The CPFA, Conn. Gen. Stat. §§ 42-133j et seq., opens with findings by the General Assembly describing the need to curb the economic power of large oil companies and large jobbers (i.e., large wholesalers or distributors) to protect the small-business people who operate individual gas stations as franchisees:

> [t]he legislature of the state of Connecticut finds and declares that the distribution and sales of gasoline and petroleum products through franchise within the state of Connecticut, including the rights and obligations of suppliers and dealers, vitally affects its general economy. In order to promote the public interest and public welfare, to avoid undue control of the dealer by suppliers, to foster and keep alive vigorous and healthy competition for the benefit of the public by prohibiting practices through which fair and honest competition is destroyed or prevented. . . and to offset evident abuses within the petroleum industry as a result of inequitable economic power, it is necessary to legislate standards pursuant to the exercise of the police power of this state governing the relationship between suppliers and distributors of gasoline and petroleum products and the dealers within the state who sell those products to the public.

Conn. Gen. Stat. § 42-133j. The statute implements these findings, among other things, by (1) restricting the ability of franchisors—be they suppliers or wholesalers—to terminate franchise agreements and by prohibiting certain provisions in those agreements that would limit the rights of franchisees, § 42-133l, (2) voiding provisions requiring the consent of the franchisor to assignment of the franchise, § 42-133m, and (3) requiring the renewal of a franchise agreement by a successor owner (i.e., a successor franchisor) who has purchased "two or more marketing premises marketed as a package" from a previous franchisor. § 42-133mm(b). The interpretation

of "bona fide offer" in Section 42-133mm(c) must take account of the CPFA's purpose of protecting gas retailers like the plaintiffs from the greater economic power held by suppliers and large jobbers. *Cf., e.g.*, *Esden v. Bank of Boston*, 229 F.3d 154, 175 (2d Cir. 2000) (approving IRS rules concerning interest rates used by employee benefit plans as being "consistent with both express congressional intent and the general protective purpose of ERISA" and citing congressional declaration of findings and policy in ERISA).

Defendants' interpretation of the statute—under which a "bona fide offer" is simply one that is binding and not the product of collusion (or "fraud" or "deceit")—fails to account for the CPFA's purpose of protecting gas retailers. Worse, it makes the right of first refusal meaningless in many multi-property transactions. *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)). Under the defendants' reading, any offer PMG might have made for the marketing premises associated with each plaintiff's property—no matter what its price, no matter what its relationship to the fair market value of that property, and no matter how remote it rendered the prospect that the plaintiffs would exercise their statutory rights of first refusal—would be bona fide, as long as it was binding on PMG and not the product of collusion with Marathon. Adopting this interpretation would make the statutory right of first refusal a nullity in any case in which the third party offeror had the wherewithal and the incentive to make the offer for a marketing premises so high—and, necessarily, well above fair market value—as to eliminate any prospect that the franchisee might exercise its right of first refusal. The third party would have an incentive to pay more than fair market value to deter the exercise of a right of first refusal whenever it wanted to purchase the property and had the ability to adjust other features of its

overall proposal to recover its overpayment. Large, well-resourced third-party buyers would have that ability in multiple-property transactions in which a right of first refusal applied to fewer than all of the properties in the transaction (because, as in this case, some properties were located in other jurisdictions). Countering the advantages over individual franchisees conferred by such economic power was a key purpose of the CPFA. Defendants' construction of Section 42-133mm(c) would defeat that purpose, and allow large, well-resourced third parties to structure multiple-property transactions so as to nullify the right of first refusal conferred by the General Assembly. To avoid such a circumvention of the General Assembly's purposes, then, I must interpret "bona fide offer" to mean something more than a binding offer that is not the product of collusion.

Clues to what that "something more" might be appear in judicial interpretations of analogous provisions of the federal Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801–06 ("PMPA"). Like the CPFA, the PMPA was enacted to protect gas station franchisees in dealings with their franchisors—large oil companies or distributors. *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3d Cir. 1987) (noting that when it enacted the PMPA, "Congress found that franchisors had used their superior bargaining power and the threat of termination to gain an unfair advantage in contract disputes"). One provision of the statute similar but not identical to Section 42-133mm(c) of the CPFA conditions a franchisor's right to terminate a franchise agreement on, among other things, the franchisor's "either ma[king] a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in [the real estate associated with the gas station], or, if applicable, offer[ing] the franchisee a right of first refusal of at least 45 days duration of an offer, made by another, to purchase such francisor's interest in [the real estate]." 15 U.S.C. § 2802(b)(2)(E)(iii)(1).

Courts interpreting this provision in the context of sales by the franchisor to the franchisee have held that "a bona fide offer under the PMPA is measured by an objective market standard. To be objectively reasonable, an offer must approach fair market value." *Ellis v. Mobil Oil*, 969 F.2d 784, 777–78 (9th Cir. 1992) (internal quotation marks omitted). They have reached this conclusion by a road that tracks the one I have followed thus far in interpreting the CPFA, i.e., that adopting a purely subjective standard would defeat the statutory purpose of protecting gas station franchisees from uneven bargaining power held by franchisors:

> [T]he overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship. Because of the distributor's need to adjust to changing market conditions, however, Congress permitted distributors to end the franchise relationship for legitimate business reasons. Yet in doing so, distributors still deprived franchisees of their reasonable expectations. The bona fide offer provision therefore serves as a second, and distinct, layer of protection, assuring the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to end the franchise relationship.

> Permitting the distributor to set an offer price as high as it wished would not provide this second layer of protection because the distributor's business plans may lead it to wish to retain the property. Distributors would set offer prices that compensated them fully for the loss of their business plans. Alternatively, distributors would set an even higher price if they thought the franchisee would pay it. The special desire of a franchisee to maintain the property with which he has worked is exactly what produces the distributor's general bargaining advantage. Either price, a price reflecting the distributor's desire to pursue its business plans or a price reflecting the franchisor's special commitment to the property, might fail to compensate the franchisee for the loss of his reasonable expectation of renewal.

> To protect the interests of franchisees, we believe that the statute effectively requires the distributor to set an offer price ignoring both its own alternative business plans and the special needs of a franchisee to hold on to the property. Rather, the statute requires the distributor to make an offer as if it "actually" wanted to sell the property (not necessarily to the franchisee but to someone). With such a desire, however, the distributor would set an offer price at fair market value. That, by definition, is the highest price a willing buyer would pay, and an offer at fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property.

*Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3rd Cir. 1987); *see also LCA Corp. v. Shell Oil Co.*, 916 F.2d 434, 437 (8th Cir. 1990) ("[M]ost courts, including our own, have required some objective reasonableness in order for the offer to be bona fide."); *Sandlin v. Texaco Refining and Marketing, Inc.*, 900 F.2d 1479, 1481 (10th Cir.) ("[W]e use an objective test to decide whether an offer is bona fide." (citing and quoting *Slatky*)). Thus, in deciding whether an offer by a franchisor to sell to a franchisee is "bona fide," these courts have focused on whether the offer at least neared a value quoted by an independent appraisal. *Slatky*, 830 F.2d at 485–86 (stating that, in the district court, the plaintiff had "presented the testimony of independent appraisers that disagreed markedly with the evaluations of Amoco. . . . The district court should have evaluated these specific challenges. In the face of an apparent congruence of independent appraisals that Amoco's estimate was considerably too high, the court had an obligation to state clearly why it found the Amoco estimate objectively reasonable.").

To be sure, these cases interpret the PMPA's provision governing sales of gas station premises by the franchisor to the franchisee, which uses the term "bona fide offer," rather than its provision governing rights of refusal, which uses slightly different language (and as to which there appears to be a dearth of case law). *See* 15 U.S.C. § 2802(b)(2)(E)(iii)(1). But Section 42-133mm also has a provision governing sales of gas station premises by the franchisor to the franchisee and that provision, like the one at issue here governing rights of first refusal, requires a "bona fide offer." More specifically, the term "bona fide offer" appears twice in the same sentence in Section 42-133mm(c)—once in the right-of-refusal context at issue here and once when describing what the franchisor must do if it wants to sell the marketing premises to the franchisee: "the new owner shall . . . (1) make a bona fide offer to sell, transfer or assign to the franchisee such successor owner's interest in the marketing premises; or (2) if applicable, offer the franchisee a right of first

refusal of a bona fide offer made by another acceptable to the successor to purchase such successor owner's interest in such marketing premises." Conn. Gen. Stat. Sec. 42-133mm(c).[7] When interpreting "bona fide offer," I "adopt the premise that the term should be construed, if possible, to give it a consistent meaning throughout the Act." *Gustafson*, 513 U.S. at 568. Here, it should have, as far as possible, the same meaning in the context of a sale by the franchisor to the franchisee that it has in the context of an offer made to the franchisor by a third party. Drawing on judicial interpretations of the parallel PMPA provision governing the former context, I conclude that "bona fide offer" means an offer that bears a reasonable relationship to fair market value. [8]

Defendants argue that the best evidence of fair market value is the amount that a fully informed buyer—such as PMG—is willing to pay for the property, and there is certainly authority for this proposition as a general matter. *See United States v. 564.54 Acres of Land, More or Less, Situated in Monroe and Pike Counties, Pa.,* 441 U.S. 506, 511 (1979) (noting that, in Takings cases, "[t]he Court . . . has employed concept of fair market value to determine the condemnee's loss. Under this standard, the owner is entitled to receive what a willing buyer would pay in cash to a willing seller at the time of the taking." (internal quotation marks omitted)); *Ellis*, 969 F.2d at 786 ("[W]hen a third party's offer is in the form of a single transaction for cash, the court can justifiably infer that the amount of an arms' length offer represents the value of the station."). Yet "[w]hile it is true that an arm's length transaction—the so-called 'willing buyer-willing seller' test—is the best evidence of (and often the easiest method to determine) fair market value, it is, by

---

[7] Subsection (c) itself is substantively identical to the language of subsection (a) of Section 42-133mm, which governs sales or assignments by a franchisor of a *single* marketing premises (as opposed to transactions involving sales made following the sale of multiple marketing premises); there, too, the franchisor must, before selling its interest in the marketing premises, either make a "bona fide offer" to sell to the franchisee or offer the franchisee a right of first refusal of a "bona fide offer" made by a third party.

[8] Although I have used the PMPA as an analogy here, I note that neither party suggests that the PMPA's own right of first refusal provision applies in this case.

no means, the only such evidence. Indeed, determining value is a factual inquiry." *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376, 388 (2d Cir. 2006). As shown below, the facts here suggest that while PMG's overall offer—the $30 million for 26 locations—was an "arm's length transaction," the individual prices allocated to the plaintiff's properties reflected a consideration that had nothing to do with the amounts at which PMG would have actually valued those properties in individual sales, and thus are not reliable indicators of the fair market values of the plaintiffs' properties.

In assessing multiple-property transactions, courts interpreting the PMPA have been cautious about relying on the third party offeror's allocations as indicators of the values of the individual properties involved. *See Ellis*, 969 F.2d at 786 ("If [an exchange of gas stations between franchisors] involves multiple properties, as in the present case, a stranger to the exchange would not necessarily know either the value of the entire package, or the value of any one of the independent components. . . . [The third party offeror's] internal valuation [of an individual property] cannot be accepted as conclusive. . . . The undervaluation of the leased stations in the exchange agreement is significant. . . . The undervaluation of any constituent piece automatically inflates the 'value' of the remaining parts."); *Arnold v. Amoco Oil Co.*, 872 F. Supp. 1493, 1498–99 (W.D. Va. 1995) (stating, in dicta, that "[w]hen a third party's offer takes [the] form[ of] an agreement to purchase or exchange multiple properties, . . . the value allocated to the stations may be manipulated to the advantage of the franchisor. . . . [W]here multiple properties and other obligations were negotiated in one offer, the court must scrutinize the following factors: (1) whether the valuations [of the stations] are readily apparent from the face of the offer, and (2) whether there is evidence that the valuations of [the plaintiff's stations] were manipulated to [his] disadvantage."). As shown below, such caution is especially appropriate—and the potential for

"manipulation" especially strong—where only some of the properties involved in the transaction are located in jurisdictions providing for rights of first refusal.

### 3. PMG's Individual Allocations Bear No Reasonable Relationship to Fair Market Value

The evidence at the hearing showed that the allocated prices for the twenty-six properties in the PMG-Marathon transaction bore no relationship to the fair market value of each individual station and were manipulated to the franchisees' disadvantage—and so were not "bona fide" within the meaning of Section 42-133mm(c). First, Bucaro admitted that PMG's allocations were chosen based on their projected ability to allow PMG to obtain all of the stations in the package, rather than based on each station's individual value. In fact, Bucaro stated that PMG's allocations—both the fact that PMG gave Marathon allocations at all as well as the amounts of the allocations—were driven by PMG's goal to deter franchisees in states with rights of first refusal from exercising these rights. Further, Currier concluded that some of the EBITDA multiples for the plaintiffs' stations were as high as ten times greater than he had ever seen before in the industry. And while Currier testified that "investment value" to a particular buyer may be higher than fair market value due to specific gains to that buyer, the defendants offered no specific evidence that the individual allocations were driven by such considerations. Although Bucaro offered some general testimony about PMG's desire to grow its presence in New England and benefit from fuel buying options applicable to the New England stations, there was no effort to tie any of these considerations to specific price allocations or to suggest that they justified allocated prices so divorced from objective indicators of fair market value. Further, Bucaro admitted that, while factors like economies of scale and growing PMG's New England presence influenced the *overall* purchase price of $30 million, they had "nothing to do with" the station-by-station allocations. (ECF No. 48 at 116.) Finally, and most tellingly, between PMG's revised initial offer to Marathon and its final

offer, the allocated prices for *all stations* located in states with statutory rights of first refusal increased, while the allocated prices for *all stations* in states without that right either decreased or stayed constant. That is powerful evidence that defeating the plaintiffs' statutory rights of first refusal was the main driver of the offers for their stations.

As one illustration of how divorced PMG's allocated offers were from the fair market value of the corresponding stations, consider its offer for one of the Washington, D.C. stations in the package. This allocation, which was originally undervalued by mistake in the first offer due to the omission of the value of an adjacent vacant lot, decreased from three million dollars, $1.5 million of which was attributed to the vacant lot, in the January 2 offer to two million dollars in the final offer. Bucaro was not able to offer any explanation of how this station, owned individually by the principal of PMG and half of the original value of which derived from a vacant lot, lost a million dollars in value during the span of six weeks. (ECF No. 48 at 90) ("Q. The lot didn't go down in value after you did that I'm assuming. Right? Nothing happened to make the lot less valuable in February than when you first put the million five on it? A. Nothing that I'm aware of.") The only plausible explanation appears to be that PMG considered this property to be 'safe', both because it was not subject to a statutory right of first refusal and because it was operated by PMG's principal, Ejtemai. PMG could thus allocate less of the overall purchase price to this D.C. station, freeing up dollars to add to the offer prices for stations in states in which there was a right of first refusal.

The defendants argue that, even if the prices for the stations subject to rights of first refusal were inflated, the mere fact that PMG offered to pay the allocated prices for each of the stations meant that each individual contract stood on its own and thus that each offer by PMG was "bona fide." The defendants assert that separating the transactions for individual properties using

individually enforceable contracts imposes a risk on each side that a particular agreement will not close, thus leading each side to consider the allocations seriously as a property-specific price.

But at the hearing, the only evidence of a significant risk that a given transaction might not close was that a franchisee would exercise the right of first refusal or that litigation over the right of first refusal would block or delay a closing.[9] More specifically, the evidence showed that PMG's allocations took into account two factors: (1) the risk that a franchisee in a right-of-first-refusal state would match its offer (incentivizing PMG to price the offer for that property high enough to deter this); and, (2) to a lesser extent, the risk that Marathon would reject a global offer with individual allocations that were so skewed against right-of-first-refusal properties that, in the event of litigation blocking that sale, Marathon would have to sell the rest of the properties at a disproportionately low price.[10] These risks have little connection to the fair market value of the individual properties. And it would be illogical to conclude that an offer driven primarily by an effort to forestall the exercise of a right of first refusal created by statute (albeit hedged to mitigate the risk that a court might invalidate the transaction on that basis) was "bona fide" within the meaning of that statute. Therefore, the mere fact that PMG and Marathon signed individual, binding agreements for these stations is not enough—at least in a multi-property deal involving

---

[9] Although there was some general testimony about the potential for issues with title to block a particular transaction, Bucaro acknowledged that, in reality, the risk of this problem is much less frequent, and therefore much less of a concern, than an exercise of the right of first refusal. (ECF No. 48 at 115–16.) There was no specific evidence of title issues offered with respect to any of the twenty-six properties involved in the PMG-Marathon transaction.

[10] To illustrate this consideration, consider a hypothetical situation where, of the total $30 million purchase price, PMG allocated $29.9 million to a station where the potential for a franchisee exercising a right of first refusal was high and then priced the other 25 stations at trivial amounts totaling $100,000. In this example, that allocation would serve PMG's goal of purchasing all of the stations, without any exercise of first refusal rights, but Marathon might be unwilling to accept such an offer because of the risk that it might have to sell 25 stations for $100,000, if a court blocked the sale of the 26th station. This illustrates that PMG necessarily had to consider both rights of first refusal and Marathon's chance of accepting the offer when making its allocations.

properties located in jurisdictions with different rules regarding a right of first refusal—to make these offers bona fide.

Aside from this argument, the defendants made no serious attempt to establish any alternative basis for their allocations of the overall purchase price to the plaintiffs' stations. Bucaro did testify that PMG ascribed more value to obtaining the entire group of stations as a whole, rather than individual properties, and the transaction would yield economies of scale. He mentioned that purchasing the real estate associated with all twenty-six stations would benefit PMG by increasing its influence in New England, where it did not own many properties. But PMG made no effort to quantify either of these benefits. At the hearing, the defendants offered no evidence that PMG considered these benefits when setting their allocations, and, as noted, Bucaro admitted that such considerations influenced the overall purchase price of $30 million rather than the individual allocations. (ECF No. 48 at 116.) And although Currier testified that a station might have an "investment value" higher than fair market value, he made clear that he was not asked to determine any such value and merely said that, in his experience, a buyer might attribute a value higher than fair market value to a particular acquisition because of its own idiosyncratic circumstances. No evidence was offered that PMG considered such circumstances in setting individual price allocations. There was no evidence presented, for example, that acquiring all of the Connecticut stations in the deal would give PMG market power in this state. Further, defendants did not call their own expert or offer any other evidence to make the case that "investment value" considerations played a role in this transaction.

I conclude that the plaintiffs have established a likelihood of success on the merits of their CUTPA claim, based on the evidence presented at the hearing. While there is no case law interpreting Section 42-133mm(c), I find that plaintiffs' interpretation of the right-of-first-refusal

provision, which requires that a "bona fide offer" bear some reasonable relationship to fair market value, to be more plausible than defendants', which would make the provision a nullity in multiple-property, multiple-jurisdiction transactions like the one at issue here.

As a final consideration, a preliminary injunction in this case serves the important public interest identified by the Connecticut General Assembly in the CPFA of countering economic imbalances in the petroleum franchise industry. *See Schneiderman*, 787 F.3d at 650. So enjoining the sales of the marketing premises for the plaintiffs' stations while a final determination about the proper interpretation of the plaintiffs' statutory rights of first refusal in Section 42-133mm(c) is made serves an important public interest.

### 4. Balance of Hardships

In any event, the plaintiffs have at least made the alternative showing that there are sufficiently serious questions going to the merits of their case and that the balance of hardships tips decidedly in their favor. The novelty of the statutory interpretation issue in this case, combined with the hearing evidence showing allocations driven largely by an attempt to defeat the plaintiffs' statutory first refusal rights, easily makes the questions the plaintiffs raise "sufficiently serious . . . to make them fair ground for litigation." *Otoe-Missouria Tribe of Indians*, 769 F.3d at 110. As noted, neither the parties nor I have found case law interpreting Section 42-133mm(c) and the interpretation offered by the plaintiffs is consistent with the purpose of the CPFA and judicial interpretations of the related PMPA.

As for the balance of hardships, it tips decidedly in favor of the plaintiffs. On the one hand—if I do not grant an injunction—the plaintiffs will lose forever their rights to purchase the marketing premises for their stations at a price reflecting, to some degree, the value of their own efforts to grow their businesses over the years. The plaintiffs have been operating their stations

since 2005, 2007, and 1972, respectively, meaning that they have invested considerable time and labor in their stations. Allowing these transactions to close at prices that are many multiples higher than fair market value will deprive the plaintiffs of a realistic opportunity to execute the rights the General Assembly gave them and to reap the reward of their years managing these stations. On the other hand, the harm to the defendants—if I do grant an injunction—involves delaying the closing of their purchases on only three of the twenty-six stations involved in the overall transaction. The defendants stated at the hearing that the transactions on the other stations involved in the deal are proceeding. Further, an injunction would not prevent PMG from making new offers for the plaintiffs' stations that might allow these transactions to proceed; nor would it prevent Marathon from soliciting new third party offers to purchase these three stations. Because the potential harm to the plaintiffs from denying a preliminary injunction is both irreparable and more serious, their "legitimate concerns outweigh any potential hardships" to the defendants, and the balance of hardships tips decidedly in their favor. *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir. 2002).

D.  Bond

The parties did not brief the issue of security. Because I have concluded that the plaintiffs are entitled to a preliminary injunction, the defendants may be entitled to security from the plaintiffs while a determination on the merits is pending to cover any damages the defendants sustain if they are found to have been wrongfully enjoyed. Therefore, I STAY this order for fourteen days. Within fourteen days, the parties shall confer and shall either (1) file a joint statement setting forth their joint or respective positions as to the proper amount of a bond or other security, or, (2) failing that, file separate motions with respect to the posting of security. *See* Fed. R. Civ. P. 65(c).

**IV.     CONCLUSION**

For the reasons stated above, the plaintiffs' motion for a preliminary injunction is GRANTED. The transactions between Marathon and PMG for the Norwich, Southington, and Waterford, Connecticut, stations are enjoined pending a final determination on the merits of the plaintiffs' claims.  This order is stayed for fourteen days, as set forth above.


IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                November 6, 2017